J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Yasmine Cordova*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YASMINE CORDOVA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br>    vs.<br><br>CRAIN COMMUNICATIONS INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION** |

**INTRODUCTION**

1.      Plaintiff, on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Crain Communications Inc. ("Defendant" or "Crain").  Crain operates numerous publications containing news on specific industries.  These include *Ad Age*, a publication about advertising and media.

2.      Defendant has installed and deployed data broker and advertising platform software on its website for Ad Age, located at https://adage.com/ – (the "Website") – to secretly collect data about visitors to the Website, their devices, locations and activity to identify who they are, target them with unwanted marketing and track them on an ongoing basis.  Defendant uses the Website to provide news to individuals and entities in the advertising and media spaces, and to obtain subscriptions to Ad Age.  Defendant also auctions and sells ad space on the Website using and/or transmitting to third parties data about visitors.

3.      The data broker and advertising platform software compiles the collected data and correlates it with extensive external records these third parties already have about most Californians in order to learn the identity of Website visitors.

4.      Both Defendant and the third-party data collectors behind the software involved benefit commercially and financially from this activity. Defendant benefits because collected visitor data, and the identification of visitors using that data, are used to, *inter alia*, obtain greater revenue for ad space on the Website and to target specific visitors with ads for Defendant's publications off of the Website.  The data collectors benefit because they can sell the data, and some of them, because they earn auction fees or "take rates" for participating in the auctioning of ad space on the Website using visitor data.

5.      Related to the inclusion of the advertising platform code on the Website, Defendant runs a substantial number of marketing campaigns promoting

CLASS ACTION COMPLAINT
2

Ad Age on the LinkedIn and Facebook social media platforms.

6.      Defendant's installation and use of data broker and advertising platform software without obtaining consent or authorization violated California Penal Code § 638.51, California's Trap and Trace Law and duties under applicable common law Defendant owed to Plaintiff and other visitors to the Website similarly situated.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

8.      Defendant Crain is a Delaware corporation that is headquartered in Detroit, Michigan. This Court has specific personal jurisdiction over Defendant with respect to all claims asserted in this action.

9.      Defendant maintains ongoing commercial relationships with such California customers and residents. Defendant derives substantial revenue from California-based transactions through its operation of the Website. Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website. Defendant intended and understood that such persons would suffer injury in California.

10.     Additionally, two data brokers with which Crain partnered, installing their software on its Website, LiveRamp Holdings, Inc. ("LiveRamp") and The Trade Desk, Inc. ("Trade Desk"), are headquartered in cities in California.

11.     Defendant's effort to attract viewers from California to the Website is aided by marketing on social media/advertising platforms such as LinkedIn Corp. and Meta, two California headquartered companies. The collection of visitor data

by LinkedIn and Meta code Plaintiff installed on the Website allows LinkedIn and Meta to target visitors to the Website who use the LinkedIn and Meta platforms with specific advertising that is chosen based on those visitors' personal attributes and actions while on the Website.

12. Defendant's use of the LinkedIn code and advertising services are governed by a User Agreement that contains two provisions that tie this action to California. First, the User Agreement provides that any legal dispute between Defendant and LinkedIn relating to LinkedIn's code and services is governed by California law.[1] Second, it provides that all claims and disputes between Defendant and LinkedIn "can be litigated only in the federal or state courts in Santa Clara County, California, USA" and that Defendant "agree[s] to personal jurisdiction in those courts."

13. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

**PARTIES**

14. Plaintiff Yasmine Cordova ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Eastern District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

15. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify

---

[1] *See* https://www.linkedin.com/legal/user-agreement (last viewed 6/7/2026).

these entities when Defendant's discovery responses reveal their true names and roles.

16.     Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

17.     Defendant owns and operates the Website, providing news about advertising and media, and selling advertising space.

18.     The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking on a link or typing the Website's address into the browser address bar), and the time the Website loads on the visitor's screen.  (This location gathering occurs separately and apart from the data broker software and the social media platform code running on the Website that forms the basis of Plaintiff's claims in this action.)  Therefore, Defendant had at the very least constructive knowledge that the data broker software and advertising platform on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website from California similarly situated, while they were located in California.  It had such knowledge during the time the violations alleged herein occurred.

19.     Defendant runs campaigns for Ad Age, the publication found at the Website, on the LinkedIn and Meta social media/advertising platforms.  Appended hereto as **Exhibit A** is a PDF made of the results of a search conducted on June 8, 2026 of campaigns appearing on the LinkedIn platform.   Appended hereto as **Exhibit B** is a PDF made of the results of a search conducted on June 8, 2026 of

campaigns appearing on the Facebook platform. These campaigns appear on the "feeds" of subscribers to the LinkedIn and Facebook platforms.

20. On November 30, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to at least three (3) data brokers, and at least two (2) advertising platforms, who used and profited from that data, along with Defendant: LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta. This occurred through the operation of software and code on the Website.

**Defendant Shares Visitors' Data with at least 3 Data Brokers and at least 2 Advertising Platforms**

21. Defendant has partnered with at least three registered California data brokers, LiveRamp, Trade Desk and PubMatic, in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to LiveRamp, Trade Desk and PubMatic on the Website.

22. The LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like LiveRamp, Trade Desk and PubMatic, and social media companies LinkedIn and Meta, to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including the visitor's geolocation, device information, identification and cross-referencing of malicious cookies installed on the visitor's devices, and other traits evident from the visitor's browsers.

**Browser Fingerprinting**

23. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to

LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta?  One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience.  This assumption is simply incorrect.

24.    The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are.  (These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.)  Data Brokers and social media companies may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

25.    Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

CLASS ACTION COMPLAINT

7

26.    To be clear, *website operators* require some of the data points at issue to render the contents of a page on a website on their visitors' devices.  For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size.  What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to *third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of visitors.*  The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

27.    As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[2]

---

[2] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 6/7/2026).

28. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.[3]

29. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[4] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[5]

### The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

30. Collection of visitor data by entities such as LiveRamp, Trade Desk and PubMatic – including collection by these entities of unique identifiers that the LiveRamp, Trade Desk and PubMatic code assigns to visitors to the websites of advertising companies like Crain – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of LiveRamp, Trade Desk, PubMatic and similar organizations.

---

[3] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.
[4] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).
[5] *Id.*

31. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

### Registered California Data Brokers

32. Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data

about individuals and organizations.  Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

33.    Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

34.    Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

35.    Data brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[6]

36.    Given the amount of data available by way of California registered data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

---

[6] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at  https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

CLASS ACTION COMPLAINT
11

37.     Here, Defendant partnered with LiveRamp, Trade Desk and PubMatic by installing LiveRamp, Trade Desk, PubMatic code onto the Website.  Defendant allows LiveRamp, Trade Desk, PubMatic, and possibly other data brokers, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.  Defendant also partnered with social media companies LinkedIn and Meta to access, use, and monetize the visitor data provided by Defendant, in ways that remain undisclosed to the public.

### LiveRamp Code

38.     LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp code on Defendant's Website tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID."  The LiveRamp code functions as follows:

39.     First, when the LiveRamp code loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

40.     Second, the data obtained by the LiveRamp code is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

41.     Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number).  LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices.  The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

42. Identification of website visitors through the LiveRamp code happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based data immediately at the time of impression." It also works across devices: In other words, the LiveRamp code can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

43. Plaintiff was subjected to the LiveRamp code as described *supra* starting when she requested that the Website load on her device on November 30, 2025.

### Trade Desk Code

44. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."

45. The Trade Desk software deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database. According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."

46. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

47. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that their business depends on "ingesting more identifiable information" about individuals. Such information

would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

48.    The Trade Desk code deploys tracking cookies that are dropped on visitor's devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser.  Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]".  The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and therefore to record information about them over time."  Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

49.    Plaintiff was subjected to the Trade Desk code as described supra starting when she requested that the Website load on her device on November 30, 2025.

### PubMatic Code

50.    PubMatic helps online publishers (websites, mobile apps, etc.) manage and sell their ad space to advertisers in real time auctions. To do this, PubMatic runs code on publisher websites (such as Defendant's) and in ad slots that can track users and synchronize advertising identifiers.  Sitting between publishers and advertisers, PubMatic collects data from the publisher side (users visiting publisher sites) and makes that data available to advertisers to inform bidding and targeting decisions. PubMatic's platform involves setting cookies and using other tracking methods to recognize users across the websites in its network.  It then enriches that data by syncing it with the data collected by other ad tech vendors, creating a broad picture of a user's browsing for advertising purposes.  PubMatic's revenue depends on identifying users and auctioning their attention to advertisers; thus, it has a strong motive to gather as much signaling information about each user as possible.

51.     PubMatic's technology stack includes cookies, web beacons/pixel tags, and JavaScript code that run on publisher pages. When a user visits a site that uses PubMatic to serve ads, the following typically happens: the site's ad slots will make a request to PubMatic's servers (or a header bidding wrapper will call PubMatic) to fetch ads. In that moment, PubMatic will attempt to identify the user through use of a cookie. For example, PubMatic sets a cookie called a KADUSERCOOKIE on a user's browser; PubMatic's own literature states: "We use this cookie to uniquely identify each browser or device from which an individual user visits our partners' websites." If the KADUSERCOOKIE isn't present, PubMatic will set another one, tagging the user's browser with a unique ID value.

52.     Alongside cookies, PubMatic may use pixel tags or web beacons. These are small pieces of code or 1x1 transparent images that load from PubMatic's domain, enabling PubMatic to collect info including how a user interacts with a website or advertisement. For example, an ad served via PubMatic to a user visiting a publisher website might include a tracking pixel that notifies PubMatic if the user hovered over or clicked on the ad. According to PubMatic's documentation, the PubMatic code automatically gathers unique online identifiers (cookie IDs, device IDs), IP addresses, browser type, device type and web browsing history related to ads. It also tracks how individuals engage with ads and websites.

53.     Over time, as the user visits more sites with PubMatic operating, PubMatic builds a log of that user's ad viewing history and site visits (to the extent those sites use PubMatic). The result is a comprehensive user profile keyed to a unique ID.

54.     Plaintiff was subjected to the PubMatic code as described *supra* starting when she requested that the Website load on her device on November 30, 2025.

**LinkedIn Code**

55.     LinkedIn is an advertising juggernaut. It earns billions each year through advertising its customers products and services on the LinkedIn social media

platform. To accomplish this, it must collect tremendous amounts of data from individuals browsing the internet, identifying them, and building (and later enhancing) profiles on them.

56.    Defendant installed and configured the LinkedIn code on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by LinkedIn for Defendant's benefit, all without visitors' knowledge or consent.

57.    LinkedIn's own promotional materials for the LinkedIn code explicitly state that the technology "unlocks powerful demographic insights about your website visitors, including their job titles, companies, industries, and more."

58.    The LinkedIn code installed on the Website collects and relies on device- and browser-related data that seems merely technical and innocuous but that are frequently used to confirm a website visitor's identity. These include such minor things as browser type, version, and configuration settings, operating system architecture/version information, and display characteristics such as screen resolution and color depth.  As alleged supra, an individual can be identified based on such data, particularly when a company like LinkedIn has the individual's approximate location.

59.    The LinkedIn code specifically targets data elements that create unique digital signatures for individual users, including Plaintiff and members of the putative class. The Software causes an identifier (LinkedIn Ads ID, li_adsid) to be added into visitors' browsers (which exist on their devices) that is "persistent" – meaning it can last months or even years after the visitor's visit to a website ends. The persistent identifier(s) loaded onto a visitor's browser on her device links her visits to different websites, what she buys on them, pages she selects to view, and information she enters to a unified advertising profile of her.  This profile is used to track when she makes purchases and to target her with ads for a website operator's products when she goes to other websites. This is referred to as "retargeting."

60. LinkedIn also represents to customers like Defendant that it uses the profiles to reach visitors across devices. Defendant installed this software on its Website to enable reliable visitor identification and long-term tracking across multiple website sessions.

61. LinkedIn explains that installing the code "creates cookies" and a first-party pseudonymous identifier on visitors' browsers, supporting LinkedIn's ability to build website audiences for retargeting and to perform conversion tracking tied to member accounts.

62. LinkedIn publicly discloses to potential customers like Defendant that the "Personalized Advertising" cookies part of the LinkedIn code include:

(a) UserMatchHistory, used for an ID synchronization process and storing the last sync time;

(b) li_sugr, used to make a probabilistic match of a website visitor's identity; and

(c) _guid, used to identify a LinkedIn member for advertising through Google ads (relevant where the visitor is a LinkedIn member and the cookie is applicable).

63. The UserMatchHistory cookie, using the persistent identifiers that are loaded onto a visitor's device by the LinkedIn Software, allows LinkedIn to match up visits to different websites that deploy the LinkedIn code and tie them to a single individual.

64. Defendant's decision to deploy LinkedIn's tracking code on the Website integrates Defendant's Website into LinkedIn's advertising identity-matching and audience-building ecosystem.

65. By deploying the LinkedIn code, Defendant actively facilitates the immediate transmission of harvested identifying information from visitors' devices to LinkedIn's servers, including domains such as px.ads.linkedin.com, www.linkedin.com/px/, and snap.licdn.com. LinkedIn itself identifies (at minimum) snap.licdn.com and px.ads.linkedin.com as domains associated with the LinkedIn

Software operation. Defendant configured the LinkedIn Software to automatically route data and signals that contain a visitor's data to LinkedIn's infrastructure.

66.    Plaintiff was subjected to the LinkedIn code as described supra starting when she requested that the Website load on her device on November 30, 2025.

## Meta Code

67.    The Meta code performs data collection, behavioral analysis, user retargeting, and analytics.  It uses a sophisticated algorithm to track people, recently described by Meta whistleblowers as "absolutely relentless in the pursuit of people."[7]

68.    The Meta code allows Meta to obtain and store at least the following visitor data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).

69.    Meta utilizes the data collected through the Meta code for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as ***ad targeting and retargeting***, in which Meta uses the Meta code to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. The profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's audience network.  Meta also uses the data for ***conversion tracking***, in which Meta uses the Meta code to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter.  Data is also used for "Audience Insights and Analytics," a feature by which Meta provides data to

---

[7] Craig Clough, *Meta Doesn't Understand Its Own Algorithms, Ex-VP Testifies* (Law360.com Feb. 19, 2026), available at https://www.law360.com/articles/2443857 (last visited 6/8/20260.

businesses on user demographics, interests, and behaviors across their sites and apps. Meta also uses the data for ***cross-device and cross-platform tracking***, in which Meta uses the Meta code to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This feature ensures that advertisers can follow users across devices.

## Troubling Implications of Third-Party Data Sharing

70.     Companies using third-party tracking software – such as the LiveRamp, Trade Desk and PubMatic code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

71.      As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

72.     As data brokers, LiveRamp, Trade Desk and PubMatic can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including

CLASS ACTION COMPLAINT
19

law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

73. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[8]

74. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[9]

75. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[10]

76. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[11]  No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

---

[8] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last viewed 6/8/2026).
[9] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).
[10] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).
[11] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

CLASS ACTION COMPLAINT

77.    The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[12]

78.    In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[13]

### Data and Related Profiles of Consumers Have Economic Value

79.    The type of visitor data transmitted via the Website to LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta have economic value – as it obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website.  The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code on the Website.

80.    The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action.  For example, in 2025, the Federal Trade Commission found that many

---

[12] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).
[13] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/2026).

websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[14]

81.    As recently explained by the Law Institute:[15]

In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with

[14] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).
[15] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

CLASS ACTION COMPLAINT

22

remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

82. There exists an established market for the type of personal data collected and transmitted through the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code running on the Website – data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## **CLASS ALLEGATIONS**

83. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

CLASS ACTION COMPLAINT

23

**All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of one or more of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code running on the Website.**

84. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

85. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

86. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

      a. Whether Defendant's actions violate California common or statutory law;

      b. Whether Plaintiff and Class members are entitled to statutory damages;

      c. Whether Plaintiff and Class members are entitled to punitive damages;

      d. Whether Plaintiff and Class members are entitled to injunctive relief;

      e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

87. TYPICALITY: Plaintiff was subjected to the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code running on the Website when she visited the Website on November 30, 2025. As a result, her data was transmitted to LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta and possibly other third parties, for fingerprinting, identification and tracking purposes. Her claims are therefore typical of the Class.

88. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

89. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law, Cal. Penal Code § 638.51**

90. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

91. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

92. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or

other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

93. Each of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code§ 638.50(c).

94. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

95. Each of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code is designed to identify *to a reasonably likely degree* the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "*sources*" of the electronic communications moving from the devices to the Website are *Plaintiff and the Class members (including their devices)*.

96. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Alex & Ani, LLC*, 2026 LX 10546, at *4-7 (C.D.

Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 LX 518344, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 LX 509487, at *39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 LX 383838, at *10-15 (N.D. Cal. Sep. 2, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024);  *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

97.     Defendant did not obtain a court order before using or installing each of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

98.     Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta.

99.     Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service."  Defendant is not such a provider.

100.    Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their

CLASS ACTION COMPLAINT

27

legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

101. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

102. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

103. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

104. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

105. Defendant's deployment of LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

106. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code on the Website.

107.   Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

108.   Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website.  Further, it was perpetrated for Defendant's economic benefit.

109.   Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law.  *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

110.   The intrusion described herein would be highly offensive to a reasonable person.

111.   Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

112.   Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are therefore entitled to compensatory damages, which includes monetary damages.

113. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the LiveRamp, Trade Desk, PubMatic, LinkedIn and Meta code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

114. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## **PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2. An award of statutory damages pursuant to CIPA;

3. An award of punitive damages;

4. An award of nominal damages;

5. An order for full restitution;

6. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8. Reasonable attorneys' fees and costs; and

CLASS ACTION COMPLAINT
30

9.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: June 8, 2026            TAULER SMITH LLP

By: _____

           J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Yasmine Cordova*

CLASS ACTION COMPLAINT

31

# **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: June 8, 2026                    TAULER SMITH LLP


By: _____
     J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Yasmine Cordova*